UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | **Filed Under Seal** |
| | : | ss: New Haven, Connecticut |
| COUNTY OF NEW HAVEN | : | April 1, 2024 |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS,**
**ARREST WARRANTS, AND SEARCH AND SEIZURE WARRANT**

I, Stephanie Kooharian ("SA Kooharian"), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.     I have been employed as a Special Agent ("SA") with Homeland Security Investigations ("HSI") since May 2021, and am currently assigned to the HSI office of the Resident Agent in Charge in New Haven, CT. Prior to my employment with HSI, I was a Detective with the Manchester, New Hampshire Police Department from 2016 to 2021. Additionally, I was a Police Officer with the Central Intelligence Agency from 2014 to 2016 and the United States Capitol Police from 2012 to 2014. I graduated from the New Hampshire Police Standards and Training Academy Class 172, the Uniformed Police Training Program at the Federal Law Enforcement Training Center ("FLETC") Class 212, and the Criminal Investigator Training Program at the FLETC Class 2204. I have received training from the Manchester, New Hampshire Police Department, New Hampshire Police Standards and Training full-time Police Academy, United States Capitol Police, Central Intelligence Agency, and the FLETC. I have also received additional training from other police agencies pertaining to the continued investigations of criminal activity. I have gained experience through training at the HSI Special Agent Training course and everyday work relating to conducting these types of investigations. I have received training in money laundering and trafficking in counterfeit goods and services.

1

2.      HSI, the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and the United States Postal Inspection Service ("USPIS") are currently investigating the following individuals for selling and conspiring to sell counterfeit luxury and designer brand watches through several websites and social media accounts that they operated:

a.      IZEDIN KIMCA ("KIMCA"), an adult male born in 1999, who resides with his parents at 78 Rosewood Avenue, Apartment 5, Waterbury, Connecticut 06706 (the "SUBJECT PREMISES");

b.      DENIS NAKO ("D. NAKO"), an adult male born in 1999, who resides at 21A Ludlow Street, Worcester, MA 01603 (the "Nako Residence"); and

c.      KLEVIS NAKO ("K. NAKO"), an adult male born in 2000, who also resides at the Nako Residence.[1] According to birth certificates that D. NAKO and K. NAKO submitted to U.S. Citizenship and Immigration Services ("USCIS"), they have the same parents and are brothers. D. NAKO, K. NAKO, and their parents live together at the Nako Residence, and according to the deed for the Nako Residence, the parents purchased the residence on or about March 17, 2022. Based on applications for naturalization that they provided to USCIS, D. NAKO and K. NAKO previously lived with their parents at 560 Mill Street Apartment 101, Worcester, MA 01602 (the "Nakos' Prior Residence").

3.      I submit this affidavit in support of criminal complaints and arrest warrants charging KIMCA, D. NAKO, and K. NAKO with trafficking in and conspiring to traffic in counterfeit goods or services, in violation of 18 U.S.C. § 2320, and also charging KIMCA with

---

[1] According to the website of the Framingham State University Police Department in Framingham, MA, K. NAKO is employed there as a police officer.

knowingly engaging in a monetary transaction greater than $10,000.00 derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

4.      I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the SUBJECT PREMISES, as described in Attachment A, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1957 and 2320, as further described in Attachment B.

5.      The statements contained in this affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own investigation to include personal observations, documents and other investigative materials which I have reviewed, as well as my training and experience as a Special Agent with HSI. Since this affidavit is being submitted for the limited purpose of obtaining criminal complaints, arrest warrants, and a search and seizure warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested criminal complaints, arrest warrants, and search warrant.

## RELEVANT STATUTES

6.      18 U.S.C. § 2320(a) provides, in relevant part, that "[w]hoever intentionally—(1) traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services, [or] (2) traffics in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive, [shall be guilty of an offense]." The statute also prohibits conspiracy to commit the same.

7.      18 U.S.C. § 1957(a) provides, in relevant part, that "[w]however . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be [guilty of an offense.]" The term "specified unlawful activity" includes violations of 18 U.S.C. § 2320.

## **FACTS ESTABLISHING PROBABLE CAUSE**

### Seizures of Counterfeit Watches Addressed to KIMCA and others at the SUBJECT PREMISES

8.      Beginning in October 2021, HSI New Haven received information from the National Intellectual Property Rights Coordination Center[2] that U.S. Customs and Border Protection ("CBP") had seized at John F. Kennedy International Airport ("JFK Airport") two parcels that CPB found to contain 18 counterfeit Rolex, Audemars, and Panerai watches[3] from Hong Kong that CPB estimated to have a combined manufacturers' suggested retail price ("MSRP") value of approximately $385,000, had the watches been authentic.[4] The seized parcels were addressed to Corey White and Justin Wojo at the SUBJECT PREMISES, where KIMCA resides with his parents.

9.      Law enforcement has not been able to identify any individuals with the name Corey White or Justin Wojo living at the SUBJECT PREMISES.

---

[2] The IPRC is led by U.S. Immigration and Customs Enforcement and brings together 25 federal and international agencies in a task force to combat intellectual property crimes.

[3] Based on my training and experience, I am aware that Rolex, Audemars, and Panerai are manufacturers of luxury watches.

[4] According to information provided to me by a CBP officer at the JFK Airport mail facility, CPB officers receive training specifically related to identifying counterfeit merchandise. These trainings include, but are not limited to, representatives from companies conducting in person trainings to train officers in detecting counterfeit markings and determining if an item is counterfeit. Additionally, companies such as Rolex, will provide bulletins and literature to CBP with information on how to identify counterfeit merchandise. In order to determine the MSRP of an item, CBP utilizes several methods, which include, but are not limited to, looking at the price of an item on the manufacturer's website, reviewing previous seizures of similar items, and at times, contacting the manufacturer.

10.     Records obtained from CBP indicate that from April 2020 to July 2022, CBP seized approximately 74 parcels containing counterfeit luxury watches associated with KIMCA. The parcels were typically shipped to the SUBJECT PREMISES, where KIMCA resides, and utilized either KIMCA's name or several aliases on the shipping label, including Izzy White, Corey White, Justin Wojo, and others. Beginning in or around April 2022, parcels were shipped to different known addresses for KIMCA, such as 43 Rosewood Avenue, Waterbury, CT, utilizing the same aliases. CBP estimated the MSRP value of seized counterfeit luxury watches associated with KIMCA was approximately $16.2 million, had the watches been authentic.

Review of Watchempo Website and Instagram Page

11.     In or around June 2022, I visited the website watchempo.com, believing it to be operated by KIMCA. The website appeared to show various brands of counterfeit luxury watches available for purchase. I viewed the "Contact Us" link on the website and observed it listed phone number ▮▮▮ 4406 ("Kimca's Phone Number")[5] and contained a link to Instagram account watch.empo. While visiting the website, I added a watch to the shopping cart, which led to a separate page. While viewing the cart, I observed several payment options, including PayPal, Klarna, Venmo, Cash App, and Debit/Credit Cards. I selected the CashApp option, which provided a drop down identifying the CashApp account as "$izedinkimca." The CashApp payment option also listed Kimca's Phone Number and email address izedinkimca7@gmail.com ("Kimca's Email Address").

12.     Based on this information, I then visited the publicly available Instagram account watch.empo and observed what appeared to be the advertisement and sale of counterfeit luxury

---

[5] As explained below, during an interview with law enforcement, KIMCA confirmed that ▮▮▮ 4406 was his phone number.

watches. I viewed several posts with photos of luxury brand name watches with the caption, "Available in stock – DM[6] or call/text us to order yours +1 [Kimca's Phone Number]." Records provided by Instagram indicate the account was registered on May 23, 2021, and listed Kimca's Phone Number as a verified phone number.

<u>HSI's Interview of KIMCA</u>

13.     On or about January 19, 2023, HSI SA Brendan Lundt and I interviewed KIMCA at JFK Airport when he arrived from an overseas trip. KIMCA confirmed that he lived at the SUBJECT PREMISES and that his phone number and email address were Kimca's Phone Number and Kimca's Email Address, identified above. Prior to continuing with the interview, I read KIMCA his *Miranda* rights. After signing a statement of rights form, KIMCA provided the following information:

        a.     KIMCA stated he sold replica watches a few years ago, but he had a package seized and received a letter from CBP advising him of the seizure. He stated that, at the time, he was not aware it was illegal to sell replica watches. He stated he purchased the watches from China. He stated he received approximately 15 to 20 notices from CBP, addressed to the individual on the shipping labels and explaining why the items were being seized and the potential violation(s) associated with the importation of the item(s). KIMCA stated the watches he received from China had the same markings as real watches and he utilized Facebook Marketplace early on to sell "luxury watches" for approximately $140.00 to $150.00 each.

---

[6] Based on my training and experience, I believe that DM is an abbreviation for "direct message," which refers to a private message sent between two users on a social media platform.

b.      KIMCA stated he would wire money via MoneyGram or Western Union to his supplier in China. After several transactions, KIMCA stated he contacted the supplier about buying in bulk to cut down the cost.

c.      KIMCA stated each package contained approximately 10 watches, which resulted in him making a profit of approximately $60.00 per watch. KIMCA stated that, at that time, he was making approximately $5,000.00 to $6,000.00 per month selling the watches.

d.      KIMCA stated he stopped selling the watches at various points because he knew it was wrong, and he attempted other businesses. KIMCA stated those other businesses were not doing well, so he began selling watches again. KIMCA stated he utilized an Instagram page (@watch.empo) and a website (watchempo.com) to sell the watches. KIMCA stated that to purchase from the website and complete the transaction, the individual would have to text him to pay via CashApp, PayPal, or other means. KIMCA stated he then sent an invoice to that individual via text message.

e.      KIMCA identified several websites and social media accounts he utilized to sell watches, which included, but were not limited to: watchfluent.co, watchempo.com, watch Slick, Pro Lux, and Luxury Time.

f.      KIMCA stated his website, WatchSlick was shut down. When I asked KIMCA why he thought the website may have been shut down, KIMCA responded, "obviously, it's a replica." KIMCA stated if "they" found out what you were doing, you would get shut down.

g.      When I asked KIMCA if he began utilizing another address after packages sent to him were seized, KIMCA stated he began utilizing 43 Rosewood Avenue[7] because he knew

---

[7]According to Google Maps, 43 Rosewood Avenue, Waterbury, CT is approximately 285 feet away from the SUBJECT PREMISES.

the person who lived there. I then asked KIMCA if he utilized the name "Izzy White" on the shipping labels for the packages containing watches, showed him a shipping label with that name, and asked if the packages looked like that. KIMCA stated yes, but he never checked the names on the packages. I showed KIMCA photographs of shipping labels from seized packages and asked if any parcels similar to those would have contained watches destined for him, and he responded yes.

       h.     KIMCA stated he sent a money order of $50,000.00 to his supplier in China. KIMCA stated the order was for approximately 1,000 watches and the parcel(s) were seized by CBP, causing him to lose the $50,000.00. KIMCA explained he paid the supplier in China prior to receiving the watches.

       i.      KIMCA stated he had several hundred additional watches still in his possession. SA Lundt and I advised KIMCA during the interview not to sell any additional watches or have anyone else sell the watches for him.  We advised KIMCA that it was not illegal to possess the watches, but it was illegal to sell them.

Website Domain Registration Records

      14.    Records from Namecheap.com and GoDaddy.com, which provide domain registration and web hosting services, indicate that KIMCA registered several domain names related to watches.

      15.    Specifically, a Namecheap account in the name "izedin kimca," listing the SUBJECT PREMISES, Kimca's Phone Number, and Kimca's Email Address, was used to register the following domain names on the following dates:

      a.     watchoholics.co on November 23, 2022;

      b.     watchfluent.co on August 3, 2022; and

8

      c.      watchempo.com on June 9, 2021.

16.      In addition, a GoDaddy account in the name "Izedin Kimca," listing the SUBJECT PREMISES, Kimca's Phone Number, and Kimca's Email Address was used to register the domain name watchslick.com on April 28, 2021.

<u>Review of Websites and Social Media Accounts Identified by KIMCA</u>

17.      On or about January 23, 2023, I visited the website watchfluent.co, which KIMCA identified in his interview, and I observed what appeared to be the advertisement and sale of counterfeit luxury watches. The Customer Service section of the website listed phone numbers ▮▮▮▮ 9062 ("Phone Number 9062"), which I know is used by KIMCA's wife, and ▮▮▮▮ 1636 ("Phone Number 1636").[8] I selected a Daytona 40mm Black Dial Steel watch, which brought up a photo of the watch with a business card in the background for "The Watch Fluent." I then searched for a similar account name on Facebook and located a publicly available Facebook account, identified as Watch Fluent. In a post dated November 22, 2022, Watch Fluent posted a picture of a watch with a Rolex symbol on it with the message, "To see our inventory DM or #[Phone Number 9062] us."

18.      I subsequently searched for Instagram accounts with a similar name and located the following two publicly available Instagram accounts: watch.fleunt and watchfluent.eu. On the watch.fleunt Instagram account, I observed a post dated May 25, 2023, containing a photo of a watch with a Rolex symbol and the same "The Watch Fluent" business card in the background. The post contained the message, "In Stock / Contact us for orders DM or #[Phone Number 1636]," which is the same phone number listed in the Customer Service section of the watchfluent.co website that KIMCA identified in his interview. On the watchfluent.eu Instagram account, I

---

[8] Documents that KIMCA's wife submitted to USCIS list her phone number as ▮▮▮-9062.

observed a post dated December 25, 2022, containing a photo of a watch with a Rolex symbol and the same "The Watch Fluent" business card in the background. The post contained the message, "In Stock! DM or Text / Call us at + 1 ███████ 2947." In additional photos posted on the Instagram account watchfluent.eu, the phone number listed on "The Watch Fluent" business card was visible and showed Phone Number 9062, which is the same as the second phone number listed in the Customer Service section of the watchfluent.co website that KIMCA identified in his interview. Records provided by Instagram indicate that the watch.fleunt account was registered on May 26, 2023, and listed an email address of aizwatchesllc@gmail.com. The records indicate that the watchfluent.eu account was registered on December 4, 2022, and listed a verified phone number of +355672173083.

19.      In addition, as noted above, Namecheap identified watchoholics.co as another domain that KIMCA had registered. I located a similar publicly available account name on Instagram, Instagram account watch.oholics, which advertised the sale of luxury brand name watches.  The Instagram page provided a contact phone number of ███████ 2358 ("Phone Number 2358"). Records provided by Instagram indicate that the account was registered on November 3, 2022, and listed Phone Number 2358 as a verified phone number.

20.      On or about May 8, 2023, I visited the website watchoholics.co, and I observed the Customer Support phone number listed on the website was Phone Number 2358, which was the same phone number listed on the watch.oholics Instagram page.

21.      According to records provided by T-Mobile, Phone Number 2358 was activated on November 3, 2022. The records listed the subscriber as one of KIMCA's parents and listed the subscriber's address as the SUBJECT PREMISES. The account was terminated on October 1, 2023.

<u>Undercover Purchase #1</u>

22.     As noted above, Watch.oholics is an Instagram marketplace, publicly viewable to all Instagram users, which advertises the sale of luxury brand name watches. Watch.oholics advises customers to send a direct message on Instagram to Watch.oholics to place an order, and it indicates that it accepts payment via Klarna, Sezzle, Affirm/Shop Pay, PayPal, debit, and credit card.

23.     On or about May 4, 2023, an IRS-CI undercover agent ("UCA-1"), who was located in Connecticut at the time, sent a direct message via Instagram to Watch.oholics. UCA-1 expressed interest in purchasing a watch and asked what was presently available. Watch.oholics responded via direct message and sent seven photos containing approximately 133 watches.

24.     UCA-1 and Watch.oholics continued to exchange communications that day via direct message on Instagram:

        a.     Watch.oholics indicated the watches ranged from $205.00 to $225.00 shipped, which I understand to mean with shipping included. Watch.oholics offered to send a video of any watch that interested UCA-1. UCA-1 responded and requested to see two different watches. Watch.oholics responded and provided two videos displaying two watches bearing the Rolex branding. Watch.oholics identified the price for each watch shown as $205.00 shipped. Watch.oholics described the watches as having the "same weight as the real deal, same details as the real deal[.]"

        b.     UCA-1 then requested to purchase the blue watch observed in one of the videos. The blue watch had Rolex branding. UCA-1 asked if the watch came with the box depicted in the video. Watch.oholics indicated the box and paper was an additional $55.00. UCA-1 agreed to purchase the blue watch as seen in the video along with the box and papers.

      c.      UCA-1 asked what was the best way to pay. Watch.oholics responded and provided the following payment methods: PayPal, Klarna, Zelle, debit/credit, Amazon Pay, CashApp, Shop Pay/Affirm, and Sezzle. Watch.oholics also stated it ships from the United States via U.S. Postal Service ("USPS"), provided three USPS mailing options and costs, and noted delivery time is one to five days.

      d.      UCA-1 indicated his preferred method of payment as Zelle.  Watch.oholics provided an email address of wfluent99@gmail.com and the first name of an individual I know to be one KIMCA's parents. Watch.oholics requested that UCA-1 provide UCA-1's full name and shipping address when UCA-1 sends payment.

25.     Later on May 4, 2023, UCA-1 sent a payment of $260.00 via Zelle, as instructed. As part of the Zelle payment, UCA-1 listed a shipping address, which was an undercover mailbox in Massachusetts. Watch.oholics responded via Instagram direct message confirming receipt of payment.

26.     The Zelle account listed the recipient's name as an individual I know to be one of KIMCA's parents.

27.     Later that evening, Watch.oholics sent a picture via Instagram direct message of the shipping label addressed to UCA-1 at the address UCA-1 provided. The label contained a return address of AIZ Watches, 43 Rosewood Avenue, Waterbury, CT 06706, which, as noted above, is an address that KIMCA admitted to using. The label also had a U.S. Postal Service ("USPS") tracking number.

28.     The package, however, was never delivered. I conducted a query of the tracking number on USPS's website, which indicated that a shipping label was created in Waterbury, CT on May 5, 2023; an item was expected for mailing in Brooklyn, NY and then departed a post office

in Brooklyn, NY on May 6, 2023; and the package was processed to return to sender on May 16, 2023.

29.     On or about May 17, 2023, UCA-1 sent a direct message via Instagram to watch.oholics indicating that UCA-1 did not receive the package and that the tracking information said it was being returned to the sender. On or about May 18, 2023, UCA-1 send another direct message asking for an update on the watch.  Watch.oholics responded and said the watch had been returned to them and they were not sure why it was returned.

30.     I subsequently contacted a U.S. Postal Inspector who verified the package was shipped with insufficient postage which caused the package to be returned to sender; however, the return address was not a complete address which resulted in the package being sent to a USPS location in Atlanta, GA.  To date, attempts at recovering the package have been unsuccessful.

31.     Records obtained from Zelle indicate that UCA-1's payment was sent to a Zelle account registered in the name of one of KIMCA's parents. Records from Bank of America indicate that the Zelle payment from UCA-1 was then deposited into a Bank of America account ending in 7993 (the "BoA-7993" Account).  According to Bank of America records, the BoA-7993 Account is a joint checking account, and a Personal Signature Card, dated November 7, 2023, identifies KIMCA and one of KIMCA's parents as the account holders.

Undercover Purchase #2

32.     On or about July 7, 2023, a second IRS-CI undercover agent ("UCA-2"), who was located in Connecticut at the time, visited website www.watchfluent.co for the purpose of purchasing a men's wristwatch. As noted above, www.watchfluent.co is one of the websites KIMCA admitted he used to sell watches and is one of the websites whose domain registration records are associated with KIMCA.  UCA-2 submitted an online order, order number 4109, to

purchase two identical men's Rolex wrist watches, Datejust Oyster 41mm/Gold Dial Two Tone watches.  UCA-2 entered a credit card to pay for order 4109 totaling $488.83.  Immediately after UCA-2 submitted order 4109, the website displayed the message, "Thank you.  Your order has been received."  UCA-2 did not receive an email or text message confirmation for the online order 4109.

33.     On or about July 8, 2023, UCA-2 received a phone call from an individual who identified himself as "Izzy" from Phone Number 9062.  The caller identification listed the name of one of KIMCA's parents. UCA-2 recorded the call.[9]

34.     During the call, Izzy informed UCA-2 he was calling from Watch Fluent. Izzy informed UCA-2 his payment failed.  Izzy stated that because it is a high-risk business, none of the United States payment processors will accept their business in the United States.  Izzy informed UCA-2 that he connected his website with a payment processor in China and some payments fail. Izzy informed UCA-2 if he wanted to continue with the purchase, he would send UCA-2 an invoice and UCA-2 could provide the card number. Izzy could then complete the transaction using the payment processor Stripe.  Izzy offered to provide UCA-2 with a $15.00 discount for the failure of the payment processor.

35.     Also during this call, UCA-2 asked Izzy about an option on his website for "box and papers."  UCA-2 asked what exactly was provided when box and papers is selected.  Izzy sent UCA-2 a text message from the same phone number, Phone Number 9062, of a green box containing the Rolex branding and a photo of a package of papers containing the Rolex branding. Izzy explained the papers contain documentation indicating the watch is a real Rolex.

---

[9] UCA-2 was not in Connecticut at the time he received the call.

36.     During the call, UCA-2 asked if Izzy had a store, and Izzy explained that it was impossible to have a store as he was selling replica watches.  Izzy explained he operated only online.  Izzy asked if UCA-2 found him on Instagram, and UCA-2 confirmed that he did.  Izzy informed UCA-2 that the watch is not a real Rolex.  Izzy stated a real Rolex would cost $25,000.00. Izzy explained the watches were high quality replicas.  UCA-2 informed Izzy he would check his email for the invoice.

37.     While on the phone, Izzy sent an email with the subject line "Invoice #D568" to UCA-2's email account. The email contained an order summary for one watch with box and paper for $250.00 and fees of $12.50 for a total of $262.50 and a note to "Complete your purchase" followed by an internet link to "Visit our store."

38.     On or about July 12, 2023, UCA-2, while in Connecticut, clicked on the link and completed the order to purchase a men's Rolex wristwatch, a Datejust Oyster 41mm/Gold Dial Two Tone.  UCA-2 entered a credit card number to pay $262.50. UCA-2 provided an undercover mailbox in New York as the shipping address, and upon submitting the order, the website displayed a message confirming the order.

39.     Later that morning, UCA-2 received an email from "AIZ Watches aizwatchesllc@gmail.com."  The subject line of the email was "Order #1383 confirmed" and the email contained an order summary for one watch with box and paper for $250.00 and fees of $12.50 for a total of $262.50.

40.     That afternoon, UCA-2 received an email from "AIZ Watches noreply@shippingeasy.com" containing a USPS tracking number and indicating that the package was shipped on July 12, 2023.

41.     On or about July 17, 2023, UCA-2 and IRS-CI Special Agent Jonathan Simon went to the United Parcel Service ("UPS") store in New York where the undercover mailbox was located and retrieved the package, which listed a return address of AIZ Watches, 43 Rosewood Avenue, Waterbury, CT 06706.

42.     The same day, SA Simon brought the package from the UPS store to the IRS-CI New Haven office, where it was opened. The package contained a men's wristwatch that was gold and silver in color and branded with the name Rolex, a green box branded with the name Rolex, a green and gold shopping bag branded with the name Rolex, a package containing a credit card sized card branded with the name Rolex, a piece of paper identifying a one year warranty branded with the name Rolex, a cleaning cloth, and a green credit card sized wallet branded with the name Rolex.

43.     On or about July 24, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-2. The estimator inspected the watch and packaging to determine if it was a counterfeit watch. On or about August 17, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was "a non-genuine Rolex watch. The appearance of the Watch is such that it could very easily mislead a customer to believe that this is a genuine Rolex Datejust." According to the affidavit, the Watch contained a non-genuine copy of the Rolex "Crown Device" on the dial and the watch was not manufactured by Rolex.

44.     In addition, according to a publicly available database on the U.S. Patent and Trademark Office ("PTO"), Rolex owns numerous trademarks registered with the PTO, including, but not limited to, the trademarks and trade names Rolex and the Crown Device (design).

45.     As noted above, in the phone call that Izzy placed to UCA-2, Izzy indicated that the credit card payment would be processed by Stripe. According to records provided by Stripe, UCA-2's payment was processed by a Stripe account registered in the name of "Izzys Store LLC dba SP AIZ Aparts LLC" and listed the representative as one of KIMCA's parents, phone number ████2740, and address 43 Rosewood Avenue, Waterbury, CT.   The records indicate a subsequent transfer of money in excess of the purchase from the Stripe account to a Bank of America bank account ending in 8581 (the "BoA-8581 Account").[10] According to records provided by Bank of America, the Business Signature Card, dated December 22, 2022, identified the account as being in the name of Izzy's Store LLC and one of KIMCA's parents.

Identification of D. NAKO and K. NAKO

46.     As described later in this affidavit, a review of bank records revealed a significant number of money transfers between bank accounts associated with KIMCA and his parents and bank accounts associated with D. NAKO and K. NAKO. In addition, as explained below, phone records show hundreds of telephone contacts between Kimca's Phone Number and phone numbers associated with D. NAKO and K. NAKO.

47.     According to a search of government databases, CBP seized numerous parcels of counterfeit watches addressed to the Nakos' Prior Residence:

a.     On February 23, 2021, CBP seized a parcel addressed to D. NAKO at Nakos' Prior Residence and listing phone number ████8425 ("D. Nako's Phone Number")[11]

---

[10] Stripe appears to maintain an account balance which users can choose to disburse amounts to bank accounts.  The amount disbursed is believed to be from several individual purchases.

[11] D. NAKO's application for naturalization, which was signed on November 18, 2020, and submitted to USCIS, confirms his phone number is ████-8425 and email address is denisnako187@gmail.com ("D. Nako's Email Address").

on the shipping label. According to CBP, the parcel contained 10 counterfeit Rolex watches with an estimated MSRP of approximately $120,000.00.

      b.    From February 2021 to April 2022, CBP seized an additional 21 parcels addressed to the Nakos' Prior Residence, listing phone number ▓▓▓▓ 9042 ("K. Nako's Phone Number"),[12] and utilizing various aliases. According to CBP, the parcels contained counterfeit luxury watches.

      c.    The CBP estimated the total MSRP of all 22 seizures to be just over $3 million.

48.    IRS-CI SA Simon conducted open source searches on Instagram and found D. Nako's Phone Number listed on Instagram account the_watch_mob. The Instagram site advertises the sale of luxury brand watches.

49.    In or around June 2023, I reviewed D. NAKO's publicly available Facebook profile and observed he was "following" a Facebook account identified as Watch Riches. I searched for a similar account name on Instagram and located the publicly available Instagram account watch.riches, which displayed the same profile picture as the Watch Riches Facebook account. On the Instagram account, I observed what appeared to be the advertisement and sale of counterfeit luxury watches, and I viewed several posts with photos of luxury brand name watches such as Rolex. For example, I saw a post dated December 6, 2022, containing a picture of a messaging conversation that included a photo of a watch bearing the Rolex logo on the wrist of an individual and the message, "Ill be reaching out soon for another bro. Thank you [fire emoji]." Watch.riches accompanied the post with a message stating, "DM us now to place your orders [cell phone

---

[12] K. NAKO's application for naturalization, which was signed on November 17, 2020, and submitted to USCIS, confirms his phone number is ▓▓▓▓ 9042.

emoji]." Records provided by Instagram indicate that watch.riches was registered on November 28, 2022, and list email address watchriches@gmail.com. According to records provided by Google, the email address watchriches@gmail.com was created on November 30, 2022, and had a recovery phone number of ▮▮▮-0519 ("Phone Number 0519"). According to records provided by T-Mobile, Phone Number 0519 was activated on November 28, 2022, and the records listed the subscriber as one of the parents for D. NAKO and K. NAKO.

50.    According to records provided by Namecheap, the web domain watchriches.com was registered on December 12, 2021, to D. NAKO and listed the Nakos' Prior Residence, D. Nako's Phone Number, and D. Nako's Email Address. However, I was not able to view the website watchriches.com as it is no longer an active domain. The Namecheap records also indicated that D. NAKO registered Thewatchmob.co web domain and Watchmob.co web domain, which is similar in name to the Instagram account the_watch_mob discussed above.

51.    On September 28, 2023, CBP officers conducted a secondary inspection and interviewed K. NAKO at Logan International Airport in Boston, Massachusetts ("Logan Airport"), when he arrived from an overseas trip. During the inspection, CBP retrieved a cellular telephone belonging to K. NAKO and provided it to an HSI SA. The cellular telephone was placed into airplane mode prior to being turned over to the SA. The cellular telephone was then manually reviewed by the SA pursuant to HSI's Border Search Authority, and a basic, also known as a routine search, was conducted.[13] After the manual review, the phone was returned to K. NAKO. During the manual review of the K. NAKO's cellular telephone, the following was observed:

---

[13] The person who conducted the review was a Special Agent at Homeland Security Investigations and authorized as a Customs Officer to conduct border searches under 19 U.S.C. § 1401(i) as well as 1589a Immigration and Customs Enforcement Directive No. 7-6.1, Border Searches of Electronic Devices (2009).

a.    Instagram account "watchfigura," which displayed a profile picture of a watch with the words "Watch Figura" surrounding the watch. Several photographs were visible, which appeared to depict counterfeit luxury watches and the sale of those watches.

b.    KIMCA was a contact in the phone, and the contact information screen for KIMCA contained approximately 80 photographs of watches, including Rolex type watches.

c.    A text conversation between K. NAKO's cellphone and a contact titled "Izedin" (which is KIMCA's first name), dated October 6, 2021, which was not in English but included a screen shot of a $595.00 money transfer to "Klevis" (which is K. NAKO's first name).

d.    A text conversation between K. NAKO's cellphone and a contact titled "Eduardo Sifuentes Watch" that discussed the sale and shipping of Rolex type watches. Included within this conversation was an image of a United Stated Postal Service receipt.

52.    On or about October 6, 2023, I viewed the publicly available Instagram page watchfigura and observed photos of messages related to the shipment and sale of counterfeit luxury watches. Records provided by Instagram indicate the watchfigura Instagram account was registered on May 24, 2023, and listed K. Nako's Phone Number as a verified phone number.

53.    Following the identification of D. NAKO and K. NAKO, law enforcement conducted additional undercover purchases from Instagram accounts Watch.oholics, Watch.riches, and watchfigura, as described in the next sections below.

<u>Undercover Purchase #3</u>

54.    As explained in detail above, the Instagram account Watch.oholics is associated with KIMCA, and payment for a prior attempted undercover purchase was ultimately deposited into a bank account associated with KIMCA. As explained below, on November 30, 2023, law

enforcement conducted another undercover purchase from Watch.oholics, but this time the payment was deposited into a bank account associated with D. NAKO.

55.     More specifically, on November 30, 2023, UCA-2 sent a direct message via Instagram to Watch.oholics asking if there was a silver Rolex available. Watch.oholics responded providing eight photos containing numerous watches per photo. Watch.oholics informed UCA-2 the watches were $205.00 to $225.00 shipped, which I understand to mean with shipping included.[14]

56.     UCA-1 and Watch.oholics continued to exchange communications that day via direct message on Instagram:

a.     UCA-2 responded requesting to see a particular watch in one of the photos. Watch.oholics provided a video displaying a watch bearing a green watch face with Rolex branding. Watch.oholics identified the price of the watch as $205.00 shipped. Watch.oholics offered box and papers with the watch for an additional $55.00. Watch.oholics also sent a photo of box and papers. The photo identified a green bag with gray markings bearing Rolex branding, a green box bearing Rolex branding, and package of papers.

b.     UCA-2 agreed to the price, and Watch.oholics provided the following payment methods: PayPal, Klarna, Zelle, debit/credit, Amazon Pay, CashApp, Shop Pay/Affirm, and Sezzle. Watch.oholics also stated it ships via USPS, provided three USPS delivery options and costs, and noted that delivery time is one to five days.

c.     UCA-2 indicated his preferred method as Zelle with priority mail in two to three days along with the box and papers. Watch.oholics provided Phone Number 0519 for

---

[14] UCA-2 was not in Connecticut on this day.

payment through Zelle. Watch.oholics instructed UCA-2 to provide his name and shipping address when the payment is sent.  Watch.oholics provided the total payment to be $270.00.

57.    On December 2, 2023, Watch.oholics sent UCA-2 a direct message through Instagram asking if everything was okay.

58.    On December 4, 2023, UCA-2 responded and informed Watch.oholics he was about to send the Zelle payment to Phone Number 0519.  UCA-2 informed Watch,oholics that Zelle was indicating that Phone Number 0519 was enrolled as Nakos Motors, Inc.  Watch.oholics responded and confirmed the Zelle name to be correct. UCA-2, while he was in Connecticut, then completed the payment through Zelle and provided a shipping address, which was an undercover mailbox in New York. UCA-2 provided his email address and requested Watch.oholics provide him with a receipt.

59.    Later that day, Watch.oholics sent UCA-2 a direct message via Instagram containing a photo of the shipping label and a tracking number.  The shipping label identified the shipping address provided by UCA-2 but listed the wrong unit and listed the return sender as an individual named Ardit Mesi and an address known to me in Brooklyn, NY (the "Brooklyn Address"). UCA-2 informed Watch.oholics of the error and a new shipping label was sent to UCA-2.  The new shipping label corrected the shipping address and listed the same return sender name and address.

60.    On December 8, 2023, the package was delivered to the undercover mailbox in New York that UCA-2 provided as the shipping address.  On December 11, 2023, UCA-2 mailed the package to IRS-CI SA Simon, who received and opened the package the next day. The package contained a green bag with gray markings bearing Rolex branding, a green watch box bearing

Rolex branding, a silver watch with a green face bearing Rolex branding and package of papers in a wallet which contained several documents bearing Rolex branding.

61.     On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc., and provided him with the watch that UCA-2 purchased from Watch.oholics to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

62.     According to records provided by Zelle, UCA-2's payment was sent to a Zelle account registered in the name of Nakos Motors Inc. Records provided by Bank of America indicate that the Zelle payment from UCA-2 was then deposited into Bank of America account ending in 9377 (the "BoA-9377 Account") in the name of Nakos Motors INC.  The Signature Card, signed on September 9, 2021, lists D. NAKO as the signatory.

63.     The website for the Secretary of State of Massachusetts identifies D. NAKO as having registered Nako's Motors on September 1, 2021, and having since filed for dissolution on December 29, 2023.  D. NAKO was listed as the President, Treasurer, Secretary and Director of Nako's Motors.

<u>Undercover Purchase #4</u>

64.     On November 20, 2023, a third undercover agent ("UCA-3"), who was in Connecticut at the time, sent a direct message to Instagram account watch.riches asking what model Rolex watches were for sale.  Watch.riches responded by providing seven photos of watch cases containing a number of watches bearing luxury brands and additional photos of individual watches bearing luxury brands.  Watch.riches asked UCA-3 to screen shot anything UCA-3 liked and informed UCA-3 the price range was $210.00 to $320.00.

65.     UCA-3 and Watch.riches continued to exchange communications that day via direct message on Instagram:

a.      UCA-3 informed Watch.riches that UCA-3 liked the Pepsi GMT II watch with jubilee bracelet.  Watch.riches responded with a video and photo of the watch.  Watch.riches provided a price of $210.00 without a box and $280 with a box.

b.      UCA-3 asked if the watch came with papers and Watch.riches responded with a photo of a green watch box bearing Rolex branding, a cleaning cloth, and a credit card sized package containing papers bearing Rolex branding.

c.      UCA-3 asked when the watch could be shipped and Watch.riches responded tomorrow.  Watch.riches provided the following list of payment options: Credit/debit card, PayPal, Venmo, CashApp, Zelle, and a split payment option of Sezzle, Klarna, and Shop Pay/Affirm. Watch.riches also provided USPS shipping options.

d.      UCA-3 indicated he was choosing Zelle as the payment method and requested delivery via USPS Express.  Watch.riches indicated the total due was $296.00. Watch.riches provide the following Zelle payment information: "[Phone Number 0519] Nakos Motors." Watch.riches also provided the following instructions: "PLEASE DO NOT WRITE BRAND NAMES ON THE TRANSACTION LIKE ROLEX, CARTIER etc, You can write 'GOODS.'"

e.      UCA-3 made the payment via Zelle, provided an undercover mailbox in New York as the shipping address, and sent Watch.riches a screenshot depicting the payment via Zelle.  Watch.riches responded by indicating the payment was received, thanking him/her for business, and providing a photo of the shipping label.  The shipping label identified the return sender as Ardit Mesi at the Brooklyn Address, which was the same return sender information that

was on the shipping label for Undercover Purchase #3, discussed above. The shipping label also had a tracking number.

   f. Watch.riches also advised UCA-3 to save phone number &#x2588;&#x2588;&#x2588;&#x2588;7747. Watch.riches indicated WhatsApp only because "its safer for both of us (end to end encryption)."[15]

  66. The shipment was delivered to the undercover mailbox on November 22, 2023, which UCA-3 subsequently retrieved. On December 1, 2023, IRS-CI SA Simon went to UCA-3's office and took possession of the watch from UCA-3. On December 6, 2023, SA Simon opened the package, which contained a green bag with gray markings bearing Rolex branding, a green watch box bearing Rolex markings, a silver-colored watch with black face and blue and red bezel bearing Rolex branding, and a credit card sized package containing documents bearing Rolex branding.

  67. On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-3 to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

  68. According to records from Zelle and Bank of America, UCA-3's payment of $296.00 was sent to the same Zelle account in the name of Nakos Motors INC that the payment for Undercover Purchase #3 from Watch.Oholics was sent to, and the money was then deposited into the same Bank of America account, the BoA-9377 Account, in the name of Nakos Motors INC with D. NAKO as the signatory on the account.

---

[15] Based on my training and experience, I am aware that WhatsApp is a messaging service for mobile devices that enables users to chat directly or in groups using text, voice, and video. I am also aware that WhatsApp utilizes end-to-end encryption, and, as a result, it cannot provide unencrypted content to law enforcement.

Undercover Purchase #5

69.     On November 21, 2023, a fourth undercover agent ("UCA-4") sent a direct message on Instagram to account watchfigura asking if there were any Rolexes available.  Watchfigura responded in the affirmative and provided more than 90 photos containing watches bearing luxury branding.  Some of the photos contained a business card in the background identifying the business name as "The Luxury Team" and K. Nako's Phone Number.  Watchfigura asked UCA-4 which one UCA-4 liked.  UCA-4 responded by identifying a silver watch with black face and bezel bearing Rolex branding. Watchfigura responded that the watch was $210.00 for watch only and $310.00 for watch with box and papers.

70.     UCA-4 and Watchfigura continued to exchange communications that day via direct message on Instagram:

        a.      UCA-4 asked to purchase the watch with box and papers for $310.00. Watchfigura asked if UCA-4 had Zelle and UCA-4 responded in the affirmative.  Watchfigura informed UCA-4 they do USPS priority with 2 to 3 day shipping. Watchfigura provided K. Nako's Phone number to pay via Zelle.  Watchfigura informed UCA-4, "Do not write rolex or replica at the notes its copyright."

        b.      UCA-4, while in Connecticut, submitted payment via Zelle and informed Watchfigura the payment was conducted.  Watchfigura confirmed receipt of the payment and asked for a shipping address.  UCA-4 provided the address of an undercover mailbox in Pennsylvania as the shipping address.

71.     On November 27, 2023, UCA-4 received the package from Watchfigura. That same day, UCA-4 shipped the package via UPS to IRS-CI SA Simon.  SA Simon received the package the next day and opened it on November 29, 2023. The package contained a green bag with gray

marking bearing Rolex branding, a green watch box bearing Rolex branding, a watch with a silver-colored band, black bezel and black face bearing Rolex branding, and a credit card sized package containing several documents bearing Rolex branding.

72.     On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-4 to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

73.     According to records provided by Zelle, UCA-4's payment was transmitted to a Zelle account registered in the name of K. NAKO. According to records provided by Bank of America, the Zelle payment was then deposited into a Bank of America account ending in 1153, and the Personal Signature Card, dated April 6, 2021, identified K. NAKO as the account holder.

74.     The shipping label on the package that UCA-4 received from Watchfigura identified the return address as 800 Main Street Ste 14C, Holden, MA 01520-1888.

75.     According to CBP records, CBP had previously seized on March 28, 2022, a parcel addressed to 800 Main Street Ste 14C, Holden, MA 01520 that contained one counterfeit Rolex watch valued at approximately $14,000.00. The package was addressed to Mr. Hektor Odraz and listed K. Nako's Phone Number. In addition, on June 27, 2022, CBP seized a parcel addressed to 800 Main Street Ste 14C, Holden, MA 01520 that contained 8 counterfeit Rolex watches valued at approximately $99,600.00. The package was addressed to K. NAKO and listed a fake phone number of 123-789-456.

Undercover Purchase #6

76.     On March 28, 2024, a fifth undercover agent ("UCA-5"), sent a direct message to Instagram account watch.riches seeking to purchase a Rolex watch.  Watch.riches responded by

providing photos of watches, and UCA-5 selected a green one with a jubilee band. Watch.riches provided the following list of payment options: Credit/debit card, PayPal, Venmo, CashApp, Zelle, and a split payment option of Sezzle, Klarna, and Shop Pay/Affirm. Watch.riches also provided USPS shipping options. UCA-5 indicated he was choosing Zelle as the payment method and requested delivery via USPS Priority. Watch.riches indicated the total due was $210.00. Watch.riches provide the following Zelle payment information: "[Phone Number 0519] Nakos Motors." Watch.riches also provided the following instructions: "PLEASE DO NOT WRITE BRAND NAMES ON THE TRANSACTION LIKE ROLEX, CARTIER etc, You can write 'GOODS.'"

77.     UCA-5 made the payment via Zelle and provided an undercover mailbox in Hartford, Connecticut, as the shipping address. Watch.riches provided a photo of the shipping label.  The shipping label identified the return sender as Ardit Mesi at the Brooklyn Address, which was the same return sender information that was on the shipping label for prior undercover purchases, discussed above. The shipping label also had a tracking number.

78.     Watch.riches also advised UCA-5 to save phone number ▮▮▮▮ 7747. Watch.riches indicated WhatsApp only because "its safer for both of us (end to end encryption)."

79.     As of today, the package has not been delivered to the undercover mailbox.

<u>Undercover Purchase #7</u>

80.     On March 29, 2024, a sixth undercover agent ("UCA-6"), sent a direct message to Instagram account watchfigura to purchase a Rolex watch. UCA-6 exchanged communications with watchfigura and agreed to make a purchase for $240. UCA-6 indicated he wanted to pay by Zelle. Watchfigura provided K. Nako's Phone Number to pay via Zelle.  Watchfigura informed

UCA-6, "Do not write rolex or replica at the notes it's the brand, model or replica at the notes that is copyright."

81.    UCA-6 made the payment via Zelle and provided an undercover mailbox in New Haven, Connecticut, as the shipping address. Watchfigura responded "Will ship this watch to this address and send tracking as soon as I have it[.]" Watchfigura also sent another direct message to UCA-6 providing K. Nako's Phone Number again and stating, "This is my phone number, please save it incase my account gets suspended, u can text me through Whatsapp or iMessage."

82.    UCA-6 took a screenshot of his Zelle payment of $240. The Zelle application displayed K. NAKO as the payee.

83.    UCA-6 has not yet received a copy of the shipping label or tracking number. As of today, the package has not been delivered to the undercover mailbox.

<u>Records from Payment Processors</u>

84.    As described above, the various Instagram accounts that sold the counterfeit watches listed several payment methods, such as Apple Cash, PayPal, Zelle, CashApp, Stripe, Sezzle, Klarna, Venmo, and Shopify. During this investigation, law enforcement received records from several of these payment processors as well as from FISERV, which is an additional payment processor.

85.    The records indicated that Apple Cash, Paypal, Zelle, CashApp, Stripe, Sezzle, Venmo, Shopify, Klarna, and FISERV each had accounts, sometimes multiple accounts, going back to January 2020, under the name of KIMCA or one of his parents, and listing either the SUBJECT PREMISES or 43 Rosewood Avenue, Waterbury, CT as the registered address. These accounts also listed one of several registered phone numbers, including Kimca's Phone Number, ███-6222, ████-4444, ███-2740, ████-2358, ████-9062, ███-0172, ███,

████-0621, ████-6909, ████-9205, and ████-1567. Many of these payment providers allow the payment sender to add a note to the payment, and many of the payment transaction records had notes indicating the payments processed through these accounts were for purchases of watches, as discussed in more detail later in this affidavit.

86.    The records also indicated Zelle, Venmo, and CashApp each had accounts, sometimes multiple accounts, registered to D. NAKO or Nakos Motors, and listing one or more of the following: D. Nako's Phone Number, Phone Number 0519, alias ████5148 (which I believe is a phone number as 774 is the area code for Worcester, MA, where D. NAKO resides), D. Nako's Email Address, the Nako's Residence, or the Nakos' Prior Residence. Many of the payment transaction records had notes indicating the payments processed through these accounts were for purchases of watches.

87.    In addition, there were two payment processing accounts with Stripe that were under the name of KIMCA or one of KIMCA's parents and listed Kimca's Phone Number as the registered phone number, but it also listed the Nakos' Prior Residence as the registered address. Another payment processing account with Stripe was under the name of one of KIMCA's parents, but listed D. Nako's Phone Number as the registered phone number and the Nako's Prior Residence as the registered address.

<u>Additional Interactions Between KIMCA, D. NAKO, K. NAKO and Individual-A</u>

88.    An analysis of phone records showed that from October 2021 through early December 2023, D. Nako's Phone Number contacted Kimca's Phone Number approximately 1,580 times. The analysis also showed that from December 2021 to early October 2023, K. Nako's Phone Number contacted Kimca's Phone Number approximately 51 times.

89.     During the investigation, bank and other financial records were obtained for accounts in the name of KIMCA, his parents, Izzy Store LLC, D. NAKO, K. NAKO, and Nakos Motors, INC. As noted above, D. NAKO is the signatory on the bank account for Nakos Motors, INC. An analysis of the records revealed a number of transfers of funds between accounts associated with KIMCA and his parents and accounts associated with D. NAKO and K. NAKO during the period from January 2021 through December 2023:

90.     Approximately $68,085 was transferred from accounts associated with KIMCA and his parents to accounts associated with D. NAKO, and approximately $64,524 was transferred in the other direction, from accounts associated with D. NAKO to accounts associated with KIMCA and his parents.

91.     Approximately $13,350 was transferred from accounts associated with KIMCA and his parents to accounts associated with K. NAKO, and approximately $2,864 was transferred in the other direction, from accounts associated with K. NAKO to accounts associated with KIMCA and his parents.

92.     In addition, an individual ("Individual-A"), whose identity is known to me, received approximately $751,141 in transfers from accounts associated with KIMCA and his parents, D. NAKO, and K. NAKO. The following is a breakdown of this total:

        a.     Individual-A received approximately $356,515 from accounts associated from KIMCA and his parents during the period from July 2021 through October 2023. One of the transfers was a $15,000 wire transfer that referenced "watches" in the wire instructions.

        b.     Individual-A received approximately $371,529 from accounts associated with D. NAKO during the period from September 2022 through early January 2024.

c.    Individual-A received approximately $23,097 from accounts associated with K. NAKO during the period from August 2022 through early January 2024.

93.    As noted above, for Undercover Purchase #3, Undercover Purchase #4, and Undercover Purchase #6, which were associated with D. NAKO, the return sender and address on the shipping labels listed Ardit Mesi at the Brooklyn Address. Law enforcement has not been able to identify any individual with the name Ardit Mesi living at the Brooklyn Address. However, Individual-A's driver's license, which I have reviewed, lists the Brooklyn Address as her residence.

94.    In addition, tracking information for each of the shipments revealed that five of the undercover purchases discussed above were shipped from post offices in Brooklyn, NY, and New York, NY. The watch from Undercover Purchase #1 (which is associated with KIMCA) was shipped from a post office six blocks from the Brooklyn Address where Individual-A resides.

95.    Three of the undercover purchases (Undercover Purchase #1, Undercover Purchase #4, Undercover Purchase #5) were shipped from postal kiosks in post offices where images of the shippers were available. The images showed what appeared to be the same woman shipping all three packages. Based on my training and experience and my review of Individual-A's driver's license photograph, I believe the woman who shipped the three packages is Individual-A.

96.    In addition, during the September 28, 2023 manual review of K. NAKO's phone at Logan Airport, the HSI SA observed Individual-A listed as a contact. The contact information screen contained approximately 2,500 photographs of watches including Rolex type watches. The phone also contained a text conversation with Individual-A discussing the sale and shipping of Rolex type watches as well as images of United Stated Postal Service receipts and Rolex watches. The agent also observed an email from K. NAKO to Individual-A regarding Pirateship.com, which

is an online company that facilitates the creation of shipping labels and manages the tracking of shipments.

97.     According to CBP records, from February 2021 to June 2021, CBP seized seven packages that were either addressed to Individual-A or the Brooklyn Address, which is where Individual-A resides. CBP determined that the packages, collectively, contained approximately 378 counterfeit Rolex, Cartier, other luxury watches, which CBP estimated to have an MSRP of approximately $6.4 million.

<u>Shipping Account Records</u>

98.     During the investigation, law enforcement determined that KIMCA, D. NAKO, and K. NAKO utilized several online shipping management companies such as Pirate Ship, stamps.com ("Stamps"), and Shippo to facilitate the creation of shipping labels and manage the tracking of shipments.

99.     Records provided by Pirate Ship indicate the following:

        a.      On February 26, 2021, an account was registered in KIMCA's name, listing the SUBJECT PREMISES, Kimca's Phone Number, and Kimca's Email Address. From February 26, 2021, to April 26, 2023, the account was used to create approximately 3,947 shipping labels. On September 27, 2022, a return address listing "Izzy" at the Brooklyn Address (which is where Individual-A resides) was added to the account. On October 20, 2022, a return address listing "Watch Fluent" and the Brooklyn Address was added to the account. The Brooklyn Address was listed as the return address on 496 shipping labels created by this account from September 27, 2022, through April 26, 2023.

        b.      On February 1, 2021, an account was registered in D. NAKO's name listing the Nakos' Prior Residence, D. Nako's Phone Number, and D. Nako's Email Address. From

February 3, 2021, to July 27, 2023, the account was used to create approximately 3,476 shipping labels. On October 20, 2022, a return address listing "Ardit Mesi" at the Brooklyn Address (which is where Individual-A resides) was added to the account. As noted above, law enforcement has not identified any individual named "Ardit Mesi" living at the Brooklyn Address. The return address was labeled in the account in the name of Individual-A and lists the number believed to belong to Individual-A. The Brooklyn Address was listed as the return address on 1,369 shipment labels created by this account from October 20, 2022, through July 27, 2023.

   c. On February 3, 2021, an account was registered in K. NAKO's name, listing K. Nako's Phone Number. From March 27, 2021, to December 12, 2023, the Pirate Ship account was used to create approximately 636 shipping labels, including the shipping label used to mail the package from Undercover Purchase #5.

  100. Records provided by Stamps indicate the following:

   a. On April 28, 2023, an account was registered in the name of one of KIMCA's parents and was associated with the business "AIZ Watches." The account lists the 43 Rosewood Avenue, Waterbury, CT address, email address aizwatches@gmail.com, and Kimca's Phone Number. The account was used to create approximately 1,185 shipping labels, including the shipping label used to mail the packages from Undercover Purchase #1 and Undercover Purchase #2.

   b. On March 18, 2022, an account was registered in D. NAKO's name, listing the Nakos' Prior Residence, D. Nako's Phone Number, and D. Nako's Email Address. From March 18, 2022, to March 21, 2022, the account was used to create 15 shipping labels.

  101. Records provided by Shippo indicate the following: on March 30, 2022, an account was registered in D. NAKO's name, listing D. Nako's Email Address. From July 28, 2023, to

December 19, 2023, the account was used to create approximately 943 shipping labels, including the shipping label used to mail the package from Undercover Purchase #3. All but two of those labels had a return address listing "Ardit Mesi" at the Brooklyn Address (which is where Individual-A resides).

102.    USPIS analyzed USPS records based on information contained in records for the Shippo account in D. NAKO's name and the Pirate Ship account in K. NAKO's name. USPIS determined that from September 12, 2023, to December 19, 2023, approximately 369 packages associated with shipping labels created by those accounts were mailed from a USPS self-service kiosk, which are equipped with cameras. Based on a review of photographs captured by the kiosks, law enforcement identified a person who appears to be Individual-A shipping approximately 270 of those packages.

### KIMCA'S Monetary Transactions Greater Than $10,000

103.    As set forth in the next several paragraphs, I believe KIMCA has engaged in monetary transactions greater than $10,000 that involve proceeds from selling counterfeit luxury watches.

104.    Based on the investigation, KIMCA appears to be self-employed and has no reported wages with the Connecticut Department of Labor since April, 27, 2020.

a.    Specifically, in an application for naturalization he submitted to USCIS, he provided the following employment history:

i.    Self-employed, no dates provided;

ii.    Gems Sensors from February 23, 2018, to April 27, 2020;

iii.    Paty's Pantry from September 23, 2017, to July 5, 2018.

b.      According to the Connecticut Department of Labor, as of March 27, 2024, KIMCA's last reported wages were reported in the second quarter of 2020 in the amount of $2,750.00. Since the second quarter of 2020, no additional wages have been reported to the Connecticut Department of Labor.

c.      In addition, on June 29, 2023, KIMCA informed USCIS during a Naturalization Interview that from approximately January 19, 2023, he began working at a Sunoco gas station. Additionally, KIMCA claimed to have had an online business selling clothes which he began when COVID started which he had operated for approximately one and a half to two years.

d.      KIMCA also submitted a credit application for a vehicle on March 22, 2022, in which he claimed he had been self-employed for the past five years and indicated he had an annual gross income of $150,000.00.

105.    During the investigation, law enforcement identified numerous bank accounts that law enforcement believes KIMCA used for the purpose of operating a counterfeit watch business, including, but not limited to, those accounts identified above in Undercover Purchase #1 and Undercover Purchase #2, that is the BofA-7993 Account and the BofA-8581 Account, as well as the following three Bank of America accounts into which money from several payment processors, which I believe included proceeds from the sale of counterfeit watches, were deposited:

a.      Bank of America account ending in 3416 (the "BoA-3416 Account") is an individual checking account. The Personal Signature Card, dated July 7, 2021, identifies KIMCA as the sole account holder of this checking account.

b.    Bank of America account ending in 6003 (the "BoA-6003 Account"), which is a joint savings account.  The Personal Signature Card, dated July 7, 2021, for BoA-6003 identifies KIMCA and both of his parents as the account holders of this savings account.

c.    Bank of America account ending in 3255 (the "BoA-3255 Account"), which is a joint checking account.  The Personal Signature Card, dated July 7, 2021, identifies KIMCA and one of his parents as the account holders.

106.    On December 2, 2020, the balance of the BoA-3416 Account was $0.00.  From December 2, 2020, through July 27, 2021, the BoA-3416 Account received deposits totaling $81,012.47 that I believe included counterfeit watch proceeds from several payment processors. The following chart summarizes the deposits during this period that were made by payment processors into the account:

| Payment Processor | Amount |
| --- | --- |
| Zelle | $24,152.74 |
| Venmo | $14,871.95 |
| PayPal | $10,274.20 |
| CashApp | $20,032.51 |
| Merchant Bank | $ 5,083.08 |
| Apple Cash | $ 6,597.99 |
| **Total** | **$81,012.47** |

a.    During this period, 73 Zelle payments were deposited into the BoA-3416 Account, as reflected in the chart above. Zelle allows a sender of money to provide a memo with the payment.  Twelve of the 73 deposits from Zelle contained a memo referencing watch, and four of the twelve memos contained a memo with a specific reference to a Rolex model watch. In addition, 35 of the 73 Zelle payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.[16]

---

[16] The Pirate Ship records were searched by searching the name identified from the Zelle payments.  In some instances, commercial source database searches of the name found in the Zelle payment were conducted which identified an

b. During this period, a CashApp account registered in KIMCA's name received 108 payments totaling $26,208.81, and $20,032.51 was disbursed to the BoA-3416 Account, as reflected in the chart above.[17] Cashapp also allows a sender of money to add a note with the payment. The Cashapp records indicate that 29 of the 108 payments had notes that specifically reference watch or luxury brand watch models. In addition, 80 of the 108 CashApp payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.[18]

c. During this period, a Venmo account registered in KIMCA's name received 82 payments totaling $16,780.67, and 42 transfers were made from the Venmo account to the BoA-3416 Account, totaling $14,871.95, as reflected in the chart above.[19] Venmo also allows users to provide a note associated with the money transfer. The Venmo records indicate that 43 of the 82 payments contained references related to a watch or model of watch, and eights of those 82 payments specifically referenced a model of luxury brand watch. In addition, 53 of the 82

---

address which matched to an address from the Pirate Ship records. It is possible the reason not all Zelle payments were found to contain a corresponding Pirate Ship shipping label was due to the sender of the Zelle payment providing a different consignee and shipping address. This would result in not being able to match the name referenced in the Zelle payment to the Pirate Ship records.

[17] There is a variance between the amounts disbursed versus payments received as payments received are not disbursed immediately and multiple payments can be disbursed at the same time. Also, payments received prior to December 2, 2020, are included in disbursement after December 2, 2020. Additionally, during this period, additional disbursements from this Cashapp account were made to other Bank of America accounts.

[18] It is possible the reason not all of the payments were found to contain a corresponding shipping label was due to the sender of the payment providing a different consignee and shipping address.

[19] There is a variance between the amounts disbursed versus payments received as payments received are not disbursed immediately and multiple payments can be disbursed at the same time. Payments received prior to December 2, 2020, are included in disbursement after December 2, 2020. Additionally, during this period, additional disbursements from this Venmo account were made to other accounts.

payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.[20]

       d.     During this period, the BoA-3416 Account received deposits from two PayPal accounts, totaling $10,274.20, as reflected in the chart above.[21]

         i.     One of the PayPal accounts was created on May 6, 2021 and was registered in the name of one of KIMCA's parents and listed identification as "watchslick," the address as the SUBJECT PREMISES, phone number ████-0621, and email address support@watchslick.com. As noted above, KIMCA admitted in his interview to using the Watch Slick website to sell watches. During this period, the account received 80 payments totaling $16,596.38. The PayPal records indicate that 66 of the 80 transactions contained an item title of watch. In addition, 32 payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.[22]

         ii.     The second PayPal account was created on May 6, 2021, and was registered in KIMCA's name. During this period, the account received two payments totaling $393.78. Both transactions contained an item title of high-end watches. Both payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.

       e.     The Merchant Bank deposits of $5,083.08 into the BofA-3416 Account, as reflected in the chart above, originated from a FISERV account registered in the name of one of

---

[20] It is possible the reason not all of the payments were found to contain a corresponding shipping label was due to the sender of the payment providing a different consignee and shipping address.

[21] There is a variance in the amount disbursed to the BoA-3416 Account and what was received in the two PayPal accounts as payments received into PayPal accounts are not directly deposited to the user's bank account.

[22] It is possible the reason not all of the payments were found to contain a corresponding shipping label was due to the sender of the payment providing a different consignee and shipping address.

KIMCA's parents, listing the driver's license number of KIMCA's parent, the SUBJECT PREMISES as the registered address, Kimca's Phone Number as the registered phone number. The account creator had identified the products/services sold as "Jewelry, Watches, Silverware Stores." That $5,083.08 deposited into the BofA-3416 Account had been held by FISERV from payments processed in 2020. The FISERV account had processed a total of $18,006.50 in payments in 2020. FISERV did not retain customer names and did not allow senders to include a memo with the payments.

      f.    During this period, an Apple Cash account registered in the name of one of KIMCA's parents, listing the SUBJECT PREMISES as the registered address and an email address beginning with ikimca5, received 27 payments totaling $6,980.00, and 17 deposits were made from the Apple Cash account to the BoA-3416 Account, totaling $6,597.99, as reflected in the chart above. The records did not provide information about the nature of the transactions. However, 12 of the 27 payments had corresponding shipping labels created through one of the Pirate Ship accounts registered in KIMCA's name.[23]

107.    In addition to the above $81,012.47 that was deposited into the BoA-3416 Account, there were other deposits to the account during this period. By July 27, 2021, the balance in the BofA-3416 Account was $101,253.57, which included funds commingled with proceeds from counterfeit watch sales.

108.    On July 27, 2021, $99,950.00 was transferred from the BoA-3416 Account to the BoA-6003 Account, leaving a balance in the BoA-3416 Account of $1,303.57.

---

[23] It is possible the reason not all of the payments were found to contain a corresponding shipping label was due to the sender of the payment providing a different consignee and shipping address.

109.    Prior to the transfer of funds, the BoA-6003 Account had a balance of $100,049.75. After the transfer, the BoA-6003 Account had a balance of $199,999.75, which included funds commingled with the proceeds from counterfeit watch sales. From July 27, 2021, to January 18, 2021, the BoA-6003 Account carried a positive balance in excess of $87,300.

110.    On January 18, 2022, $87,300.00 was transferred from the BoA-6003 Account to the BoA-3255 Account, leaving a balance in the BoA-6003 Account of $59.60.

111.    Prior to the transfer of funds, the BoA-3255 Account had a balance of $365.76. After the transfer, the BoA-3255 Account had a balance of $87,665.76. From January 18, 2022, to February 8, 2022, BoA-3255 carried a positive balance in excess of $50,000.00.

112.    On February 8, 2022, a foreign wire transfer of $50,000.00 was sent from the BoA-3255 Account to beneficiary Huang Yujiang in Hong Kong, leaving a balance in the BofA-3255 account of $30,921.65.[24]

113.    From February 8, 2022, to March 25, 2022, the BoA-3255 Account carried a positive balance in excess of $14,000.00.

114.    On March 25, 2022, $14,000.00 was transferred from the BoA-3255 Account to the BoA-3416 Account.  The same day, a counter withdrawal of $14,000 was made from the BoA-3416 Account, and a Bank of America cashier's check in the same amount was issued, listing KIMCA as the remitter and Colonial Toyota as the payee.  According to records from Colonial

---

[24] This payment appears to be for a supply of counterfeit watches. The note associated with the wire indicates "POP Employee Compensation." Bank accounts in the name of KIMCA and his parents have sent approximately 40 wires to Huang Yujiang totaling $236,824.86, the majority of which had a note indicating "POP Employee Compensation." However, one wire on October 26, 2020, to Huang Yujuang, in the amount of $4,999.00, contained the note, "buying watches for my business POP goods." In addition, as discussed above, during KIMCA's interview with HSI agents, he admitted to sending $50,000 to his supplier in China for approximately 1,000 watches. KIMCA had identified his supplier as You-You (sic).

Analysis of D. NAKO's bank accounts also revealed seven foreign wires to Huang Yujiang between May 10, 2021, and June 9, 2022, totaling $32,994.00.

Toyota, the check was used for the down payment for the purchase of a black 2022 Toyota Camry XSE sedan vehicle, bearing VIN: 4T1K61AK8NU032428.

On-Going Activity and Recent Surveillance

115.    On January 16, 2024, the watch.oholics Instagram page was active, and on January 15, 2024, had posted a photograph of what appeared to be a customer's silver colored watch bearing Rolex branding with the comment, "another happy customer, DM us to view our inventory!"  The account advised customers to "DM us to order" and advertised payment through "secure payments-PayPal, Debit, Credit, Klarna, Sezzle and Shop Pay." However, on or about February 7, 2024, the watch.oholics Instagram page was no longer active.

116.    As noted above, as of March 28, 2024, the watch.riches Instagram page was still active, and an undercover agent conducted Undercover Purchase #6 that same day.

117.    As noted above, as of March 29, 2024, the watchfigura Instagram page was still active, and an undercover agent conducted Undercover Purchase #7 that same day.

118.    Over the course of the past several weeks, I utilized a pole camera that was installed on January 18, 2024, to review movements of KIMCA and the occupants of the SUBJECT PREMISES. On or about May 28, 2024, I observed KIMCA enter the residence.

119.    On March 30, 2024, HSI Task Force Officer (TFO) Leonardo Soto conducted surveillance at the SUBJECT PREMISES and observed KIMCA exit through the front door of the premises and enter the rear passenger seat of his vehicle that was being operated by an unknown individual.

120.    Over the course of the past several weeks, I also utilized a pole camera that was installed on January 18, 2024, to review movements of D. NAKO, K. NAKO, and the occupants of the Nako Residence. During this time, I observed D. NAKO exit the residence with shopping

42

bags, typically place them into the trunk of his vehicle, and depart the residence in his vehicle. Specifically, on March 20, 2024, while conducting surveillance of the location, I observed D. NAKO exit the residence with shopping bags, place them into the trunk of his vehicle, and depart the residence. According to USPS, D. NAKO's shipping account(s) have been actively shipping parcels during this time.

121.    On March 27, 2023, I conducted surveillance at the Nako's Residence. I observed K. NAKO exit the residence, enter his vehicle, and leave the residence in his vehicle. A short time later, K. NAKO's vehicle was observed pulling into the driveway where his father entered the passenger side of the vehicle, and the vehicle departed the residence. On the same date, SA Kooharian observed D. NAKO exit the front door of the residence, retrieve a bag from the trunk of his vehicle, and walk back into the residence.

<u>Use of Computers and Mobile Devices</u>

122.    Based on the investigation, I believe evidence of violations of 18 U.S.C. § 2320 (trafficking in and conspiring to traffic in counterfeit goods or services) and 18 U.S.C. § 1957 (engaging in a monetary transaction greater than $10,000.00 derived from specified unlawful activity), will be found at the SUBJECT PREMISES and also on computers and mobile devices at the SUBJECT PREMISES.

123.    As noted above, KIMCA, who resides at the SUBJECT PREMISES, indicated he was self-employed, has minimal reported wages to the Connecticut Department of Labor, and appears to have operated websites and social media accounts on Facebook and Instagram to sell counterfeit watches from his home.

124.    Also as noted above, customers correspond with the websites and social media accounts through electronic communications such as text message and direct messages using social media platforms.

125.    In addition, as noted above, labels for shipments to customers were prepared and printed using certain online shipping management companies, which would have required KIMCA or others working with him to log in and use software on those websites.  In addition, in order to print the labels, KIMCA or others working with him would need a printer, which I know are typically connected to computers.

126.    As noted above, KIMCA and his parents had several payment processing accounts registered in their name, some of which specifically listed the SUBJECT PREMISES as the registered address, and many of which had transactions processed through the account that specifically referenced watches. These processors can only be accessed by applications on mobile devices or by computer.

127.    The websites, Instagram accounts, and payment processing accounts belonging to KIMCA, his wife, and his parents had the following registered phone numbers: ██████-4406, ██████-9062, ██████-1636, ██████-2947, ██████-2358, ██████-2740, ██████-6222, ██████-4444, ██████-0172, ██████-0621, ██████6909, ██████-9205, and ██████-1567.

**SEARCH AND SEIZURE OF ELECTRONIC DATA**

128.    As described above and in Attachments A and B, this application seeks permission to search for and seize records that might be found at the SUBJECT PREMISES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a mobile phone, on a computer's hard drive, or on other electronic storage media.  Thus, the warrant applied

for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

129.    I submit that if a computer (to include a mobile phone) or other electronic storage media is found at the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that device, for at least the following reasons:

a.    Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.    Wholly apart from user-generated files, electronic storage media—in particular, computers' internal hard drives—contain electronic evidence of how a device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer and mobile phone users typically do not erase or delete this evidence, because special

software is typically required for that task.  However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

   130. As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers and/or mobile phones were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on computers, mobile phones, and other electronic storage media (including storage media inside computers and mobile phone) at the SUBJECT PREMISES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online usernames, nicknames, and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times a computer or mobile phone was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.        Information stored within a computer, mobile phone, or other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer, mobile phone or electronic storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer, mobile phone, or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the device was remotely accessed, thus inculpating or exculpating the device owner.  Further, computer, mobile phone, and storage media activity can indicate how and when the device was accessed or used.  For example, storage media inside computers and mobile phones typically contain information that logs: user session times and durations, activity associated with user accounts, other electronic storage media that connected with the device, and the IP addresses through which the device accessed networks and the Internet. Such information allows investigators to understand the chronological context of device access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer, mobile phone, or other electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a device may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may

47

also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the device user. Last, information stored within a device may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within the device may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer or mobile phone works can, after examining this forensic evidence in its proper context, draw conclusions about how such devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a computer or mobile phone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer or mobile phone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic

programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.     I know that when an individual uses a computer or mobile phone to commit a crime, the device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  From my training and experience, I believe that a computer or mobile phone used to commit a crime of this type may contain: data that is evidence of how the device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of discussions about the crime; and other records that indicate the nature of the offense.

131.    Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers and mobile phones, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations.

132.    In most cases, a thorough search of a premises for information that might be stored on computers and storage media often requires the seizure of the physical computer or storage media and later off-site review consistent with the warrant. In lieu of removing computers, mobile phones, and storage media from the premises, it is sometimes possible to make an image copy of the computer, phone, and storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on

the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer or mobile phone has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.     Technical requirements.  Computers and mobile phones can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

133.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably

appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

134.    Based on the aforementioned factual information, I believe there is probable cause that from on or about April 1, 2020 through the present, the exact dates being unknown, in the District of Connecticut and elsewhere, KIMCA knowingly (1) trafficked in counterfeit goods or services, and conspired with D. NAKO, K. NAKO, and other known and unknown individuals, to do the same, in violation of 18 U.S.C. § 2320, and (2) engaged in one or more monetary transactions greater than $10,000 in criminally derived property and which was derived from specified unlawful activity, in violation of 18 U.S.C. § 1957. Therefore, I respectfully request that a criminal complaint and arrest warrant be issued to support the arrest of and to charge KIMCA with such offenses.

135.    Based on the aforementioned factual information, I believe there is probable cause that from on or about February 1, 2021 through the present, the exact dates being unknown, in the District of Connecticut and elsewhere, D. NAKO and K. NAKO knowingly trafficked in counterfeit goods or services, and conspired with each other, KIMCA, and other known and unknown individuals, to do the same, in violation of 18 U.S.C. § 2320. Therefore, I respectfully request that criminal complaints and arrest warrants be issued to support the arrest of and to charge D. NAKO and K. NAKO with such offenses.

136.   In addition, based on the aforementioned factual information, I believe there is probable cause that contraband, evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2320 (trafficking in and conspiring to traffic in counterfeit goods or services) and 18 U.S.C. § 1957 (engaging in a monetary transaction greater than $10,000.00 derived from specified unlawful activity), as described in Attachment B, are located at the SUBJECT PREMISES, as described in Attachment A.   Therefore, I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, as described in Attachment A, authorizing the search and seizure of the items described in Attachment B.

_____

Special Agent Stephanie Kooharian
Homeland Security Investigations


Subscribed and sworn to before me this 1st day of April, 2024.


HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**LOCATION TO BE SEARCHED**

The premises at 78 Rosewood Avenue Apartment 5, Waterbury, CT 06706 (referred to herein and in Attachment B as "SUBJECT PREMISES"), to include computers, mobile devices, and storage media found therein. The SUBJECT PREMISES is located in the Ridgegate Apartments complex. The SUBJECT PREMISES is located in a two-story townhome style building, specifically a whitewashed brick façade building containing two apartments, apartments five and six. The building number "78" is located in between the doors to Apartment five and six in black lettering. The SUBJECT PREMISES is located in Apartment 5, which is situated to the right when facing the front of the building.  Below is a photograph of the SUBJECT PREMISES.



## ATTACHMENT B

### ITEMS TO BE SEIZED

All property, records, information, computers, mobile phones, and storage media that constitute contraband, evidence, fruits, and/or instrumentalities of violations of the following offenses related to the sale of counterfeit luxury and designer brand watches: 18 U.S.C. § 2320 (trafficking in and conspiring to traffic in counterfeit goods or services) and 18 U.S.C. § 1957 (engaging in a monetary transaction greater than $10,000.00 derived from specified unlawful activity) (collectively, the "TARGET OFFENSES"), for the time period from April 1, 2020 to the date the search warrant is executed, including, but not limited to, the following:

1.  Counterfeit watches, documentation about the authenticity of such watches, and labels, stickers, manuals, logos, containers, and packaging used in connection with the packaging, labeling, shipping, and/or distribution of such watches;

2.  Any materials containing counterfeit trademarks for Rolex, Cartier, Audemars, and Panerai, and any other manufacturer of watches;

3.  Supplier lists, ordering forms, price lists, catalogues, communications and correspondence with suppliers of counterfeit goods, and related information regarding such suppliers;

4.  Records and information related to the purchase, importation, sale, distribution, marketing, advertising, promotion, and inventory of counterfeit watches, including, but not limited to, the following: quotations; invoices; bills of sale; receipts; purchase records; sales records; waybills; customs declarations; import manifests; bills of lading; methods of shipment; tracking numbers for shipments; shipping labels and/or receipts; shipping documents; customer complaints; and communications regarding such records and information;

5.      Customer lists and any customer contact information;

6.      Records and information related to the websites watchoholics.co, watchfluent.co, watchempo.com, watch Slick, Pro Lux, and Luxury Time, and any other website used to sell counterfeit watches;

7.      Records and information related to Facebook pages Watch Fluent and Watch Riches, Instagram accounts watch.empo, watch.fleunt, watchfluent.eu, watch.oholics, the_watch_mob, watch.riches, and watchfigura, and any other Instagram accounts, Facebook accounts, or other social media accounts used to sell counterfeit watches;

8.      Records and information related to the use of online shipping software such as Pirate Ship, Stamps.com, and Shippo;

9.      Records and information related to the use of payment processing companies or services that can be used to transfer funds, including, but not limited to, PayPal, Klarna, Zelle, debit/credit, Amazon Pay, CashApp, Venmo, Stripe, Shop Pay/Affirm, and Sezzle;

10.     Communications and correspondence with U.S. customs authorities, and any communications and correspondence related to customs inspections and/or border seizures;

11.     Records, information, communications, correspondence about U.S. customs rules and regulations, and rules and regulations related to importing, selling, and distributing counterfeit goods and services, as well as records, information, communications, correspondence reflecting IZEDIN KIMCA's, DENIS NAKO's, KLEVIS NAKO's, or other co-conspirators' knowledge of such topics;

12.     Records and information related to safe deposit boxes and rentals of storage facilities, and keys for such boxes and facilities;

B-2

13.     Any safe or similar item that may be used to store counterfeit watches and the proceeds of the TARGET OFFENSES;

14.     Records, information, and communications regarding foreign companies that manufacture or sell counterfeit goods;

15.     Records and information regarding the identity of other individual(s) who contacted or who were contacted by IZEDIN KIMCA, DENIS NAKO, KLEVIS NAKO, or other co-conspirator in connection with the TARGET OFFENSES, including, but not limited to names, addresses, phone numbers, email addresses, usernames for social media or other means of electronic communication, financial account numbers, and internet protocol addresses;

16.     Records and information relating to the business, financial, and accounting activities of IZEDIN KIMCA, his wife and parents, DENIS NAKO, KLEVIS NAKO, and/or other co-conspirators, including, but not limited to, the following: general journals, subsidiary ledgers, receipt journals, disbursement journals and sales journals, accounts receivable, accounts payable, notes payable and closing ledgers, records of income and expenses, financial statements, balance sheets and income and expense journals, payroll records, bank statements, checks, check registers, deposit records, wire transfer records, withdrawal records, receipts, invoices, contracts, tax documents, credit card processing records, PayPal records, Klarna records, Zelle records, debit/credit records, Amazon Pay records, CashApp records, Venmo records, Stripe records, Shop Pay/Affirm records, Sezzle records, and and/or other records showing the transfer of money;

17.  Records and information relating to the occupancy, ownership, or purchase of the SUBJECT PREMISES or 43 Rosewood Avenue, Waterbury, CT, including utility and telephone bills, mail envelopes, or addressed correspondence;

18.  Records and information related to the purchase of a black 2022 Toyota Camry XSE bearing VIN: 4T1K61AK8NU032428;

19.  Computers, mobile phones, and storage media that IZEDIN KIMCA used as a means to commit the TARGET OFFENSES as well as mobile phones associated with the following phone numbers: ███████9062, ███████1636, ███████2947, ███████-2358, ███████ 2740, ███████-6222, ███████4444, ███████-0172, ███████-0621, ███████-6909, ███████ ███████-9205, and ███████-1567;

20.  For any computer, mobile phone, or storage medium whose seizure is authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "DEVICE"):

a.  Items 1 through 18 above;

b.  Evidence of who used, accessed, owned, or controlled the DEVICE;

c.  evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.  evidence of the lack of such malicious software;

e.  Evidence indicating how and when the DEVICE was accessed or used, and evidence indicating the geographic location of the device when it was accessed or used;

B-4

f.    evidence indicating the DEVICE user's knowledge and/or intent as it relates to the TARGET OFFENSES;

g.    evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

h.    evidence of programs (and associated data) that are designed to eliminate data from the DEVICE;

i.    passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

j.    documentation and manuals that may be necessary to access the DEVICE or to conduct a forensic examination of the DEVICE;

k.    contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, network hardware, and digital cameras. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash

drives, thumb drives, micro SD cards, macro SD cards, DVDs, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

Pursuant to Rule 41(e)(2)(B), it is authorized that electronically stored information may be imaged or copied. With respect to a DEVICE containing electronically stored information, consistent with Rule 41(e)(2)(B), the warrant is deemed executed once the DEVICE has been physically seized or copied on-site, and that review of the contents of the DEVICE is permitted at a later time.